2012-1636. Mr. Springer. Thank you, Your Honors. May it please the Court. The appellant, PIXION, contends that the United States District Court for the Northern District of California erred in granting summary judgment on behalf of CITRIX in two respects. First, with respect to the issue of non-infringement. PIXION contends that the District Court disregarded evidentiary testimony offered up by the Chief Scientist of CITRIX, Albert Alexandrov, as well as its expert, Kevin Jaffe. As to the second issue, invalidity, PIXION contends that the Court's analysis of the quote-unquote public use of the CUCME conference system was incorrect. While no one will dispute the existence of a conference system known as CUCME prior to the critical date, the issue is what was in that conference system prior to the critical date of the patent suit with respect to granting invalidity on the basis of anticipation. And there's undisputed evidence that the README files reflected what was in the system, right? I believe that there is a significant dispute as to what was in the README files, Your Honor. No, no, not what was in the README files, but whether the README files reflected what was in the system. That's undisputed, right? That is absolutely in dispute, Your Honor. So on what basis? I don't understand that. So the README files stated whatever they might have stated. Let's just take the README files. They state what they state on their face. But during the course of deposition, Mr. Cogger, Richard Cogger, was produced on behalf of, from Cornell University. He was a project manager, and he was produced, deposed, and actually paid by Citrix to provide documents and assist in the case. During his deposition, he was queried as to the issues of whether he authored the code that implemented the README files. He did not. He testified that the README files reflected what was in the system, right? What was in the program. Correct. And there was no contrary evidence, right? I disagree, because on cross-examination, if you look at the record on pages, for example, 5102, 5108, and 5110, Mr. Cogger was cross-examined. And he stated he didn't author the code, he didn't read the code, he didn't read the code in preparation. So how can he say that the README files were accurate? It's one, you know, I can write a document that says light speed is possible, but that doesn't necessarily mean it's possible. There still has to be something, you know, there has to be a there there. But he testified that he worked with the programmers on creating the README files. He testified that he did work with the programmers, but he relied upon their representation. In the end, he could not independently verify. There were better people to ask. For example, Mr. Cogger was asked, who would have been the best person to offer testimony as to what was actually in the product? And he stated Tim Dorsey. Tim Dorsey was not deposed in this litigation. So Mr. Cogger, while he originally stated, yes, I believe they're accurate, during cross-examination, he stated, I really don't know. So he had no fundamental basis. No, he didn't say he didn't know whether they were accurate. He said he hadn't looked at the source code. So how could he say, then, that the files were accurate if the source code, if he didn't know what the source code said? And this goes, then, to the testimony of Mr. Klausner, who is the expert proper. But back on that point, I mean, you didn't put in evidence to the contrary, right, to get that, in fact, the README file was not what the system, the way the system operated. This was actually addressed by Mr. Klausner in his expert report and then in his deposition as well. Mr. Klausner, who was hired on behalf of Pixeon as an expert on the issue of invalidity, testified that he saw no correlation between the documentation, the README files, and the source code. He stated clearly that he reviewed the source code and he did not see any correlation between what was in the README files as well as in the report of Mr. Jaffe, Citrix's expert. He saw no correlation between the code, the expert report of Mr. Jaffe, I'm sorry, Dr. Jaffe, as well as the testimony offered by Mr. Cogger. This is in the record. If the court would look at, for example, page 4579 of the record, and this is volume three, Your Honors, and this is actually page 51 of Mr. Klausner's testimony. He was questioned starting around line 10. He states the README is not the version. What I tell you in my paragraph 106 is the version number of the README file, et cetera. I'm sorry, Your Honor, 4578? 4579, Your Honor. 4579. Then he states that line 14 of 4579, this is Mr. Klausner speaking, but that is not the descriptive of the functionality of the software as of that date. In other words, neither Dr. Jaffe nor Mr. Cogger have shown any evidence in the source code itself that it contained any particular functionality on any particular day. That's not saying that the README files don't accurately reflect the source code. So I'll respond to your question, I guess, if you'll give me a little leeway, Your Honor. Mr. Klausner was then queried, so what is your opinion then that the README files do not accurately describe the functionality of the source code? Answer, there is no evidence. Correct. And then if you turn the page to page 4580 of the record, Mr. Klausner continued around line 6. The source code files have not been testified to by Mr. Cogger or Dr. Jaffe as to their content and functionality as of any particular date. And so there's a disconnect between what the README file claims and whatever mysteries are contained in the source code files. Question, now you, Mr. Klausner, reviewed the source code files. Correct. Answer, I have. Question, and you've reviewed the README files. Correct. Answer, I have. So he reviewed the source code, and he found no correlation between the source code and the file. Well, but then he goes on to say, and are there any inconsistencies? And he says, I don't know because I didn't review the source code for that purpose. He stopped reading just before that. It seems to me a pretty important concession on this part. Okay, and if you read beyond that, he states, I think the whole context is important, Your Honor. So continuing at line 21 of 4580, what I was doing was testing the assertions of Dr. Jaffe and Mr. Cogger. And so I don't have an opinion about that a particular source code file or version has the functionality that they claim. Okay, well, it seems to me fair to say that the consequence of all this is, what he's saying is, I don't think they've proved their case. He's not saying, what I was looking for from you is, he's not saying that source code does not, affirmatively does not correlate with the README file. In fact, he said specifically, he said specifically on line 8 of 4581, so that he has no opinion about the correlation. Mr. Klausner stated. He has no opinion as to whether the README file actually corresponds to the functionality provided in the source code. Is that correct? He said no. In that context, I believe, Your Honor, he had reviewed the report of Dr. Jaffe on invalidity. Dr. Jaffe's report had relied on the testimony of Mr. Cogger. The burden of invalidity belongs to Citrix. He rebutted the report of Dr. Jaffe on invalidity, and he saw nothing in Dr. Jaffe's report and analysis of the source code files as they pertain to the, I'm sorry, of the README files as they pertain to the actual source code. And that right there, I believe, Your Honor, in the fact, in the sense that he could not find, he could not identify a correlation between the README files and the source code files, coupled with the fact that Mr. Cogger effectively said, yes, I believe the README files are correct, but I really have no basis for offering that opinion. He didn't say that. He didn't say I have no basis. He said I worked with the programmers. He worked with the programmers, but he relied on representations of others. So the query should have been for the purpose of invalidity. What did those others actually say? And those others were, for example, Mr. Dorsey. I'm not questioning that he said he was told that, but that's hearsay, Your Honor. That can't be used to prove the case. If anything, Mr. Dorsey should have been brought in to testify as to what did the source code do? What were you doing on this date? Mr. Cogger very clearly stated that Mr. Dorsey was the best person to talk to in that regard, but his knowledge was based on representations by others. And there's no evidence that those representations were, in fact, true. So in that regard, the burden belonging to Citrix on the issue of invalidity countered with the testimony of Mr. Klosner, who reviewed the report on invalidity, coupled with Mr. Cogger's statements that he didn't really know for sure, beyond the statements that he was told by others, I believe that creates a serious question of material fact that for the purpose of summary judgment, the deference goes to Pixian in that regard. There's also the issue, Your Honor, with respect to the non-infringement issue, which I raised originally. Before we go back to that, if I understand correctly, Mr. Klosner did not testify that the capabilities of the participant computers were not checked before the beginning of the conference call? I do not recall that in the record, Your Honor, no. Okay. But Mr. Klosner, again, was being deposed, or his testimony was offered exclusively as a counter to what was being proffered by Mr. Cogger, and more specifically, Dr. Jaffe, who relied upon the representations of Mr. Cogger. Now, turning to the issue of non-infringement, the district court found that there was non-infringement contending that Dr. Stevenson, the expert at Perfixion, had not proved the presence of various elements. And one of those key elements was in the case of the 515 and the 304 patents, one or more characteristics of provided conferencing data being based on current capabilities of at least one client. Well, the district court construed characteristics of the provided conferencing data to be size and content. The district court also construed client capabilities to be inclusive of bandwidth between a client and a server. Now, looking to the operation of the SetSync technology, which is the quote-unquote heart of the Citrix communication model, there's that concept of epochs, which represent screen captures over the course of time. And as was evidenced by the testimony of Dr. Stevenson, who relied upon both the testimony of Dr. Jaffe, as well as the deposition of Mr. Alexandrov, is if there's a slow connection, there's going to be epochs dropped, because the way SetSync works is it only sends the current available epoch. It doesn't wait for confirmation of T1, the first epoch, to be sent back, and then it sends T2, and then T3. It doesn't send them ordinarily. It sends the next available epoch. So what's the evidence that client capabilities were collected before the conference started? So there is an issue there in the sense that there's no requirement that capabilities be collected. All that is required is that one or more characteristics of the provided conferencing data be based on the current capabilities. Now there is the issue of timing of when that current capability is determined. So in the context of the 191 and the 331 patents, which we sort of refer to as the in-conference patents, because those determinations are made during the conference, that's a bit of a no-brainer, Your Honors, in the sense that SetSync is designed to operate in the context of the conference. Yeah, yeah, but to go back to Judge Steyer's question, where is there validation, which is a term I think used by the parties, validation of the client's capabilities in the SetSync system? So that takes place with respect to SetSync's integration with the operating system in the communications stack of the computer where SetSync is operating. Well, be specific exactly what does SetSync do that constitutes validating an individual client, as opposed to simply pushing the epochs down the line and then the clients pick up as many of them as frequently as they can depending on their capabilities. That doesn't count as validation, I take it. So SetSync... Let me make sure I say that, and then I want to make sure I have your answer. You wouldn't count just pushing epochs, if all the system does is push epochs down and the various clients that have different capabilities pick up all some or a few of the epochs. You wouldn't consider that validation, right? I don't consider the mere pushing of data to be validation. Okay, where's the validation? What exactly does SetSync do that constitutes validation? So validation was a term that was never construed, that in retrospect maybe it should have been, but that issue aside, SetSync is integrated with the operating system in the communications stack, which involves the use of the transmission control protocol. That's not helpful to me. Okay. That's all computer speak. Tell me what exact step that SetSync performs constitutes validation. Sure. So as described by Dr. Alexandrov as well as Dr. Jaffe, SetSync is integrated with the operating system at the computer. That's what you said before. Okay, but data cannot be sent from one computer to another without integrating with that operating system. Now what happens, the way SetSync integrates with the operating system of a presenter, a presenting computer, which could be the conference you're presenting or it could be the multicast server down the line, is it will not allow the next epoch to be sent, whatever that number might be, two, three, four, 100, until it's received confirmation that the prior epoch has been received. Now if that's a very slow network, when it finally receives that confirmation- What does that have to do with the client capabilities? Because client capability is inclusive of bandwidth connection. So the court's construction as is shown on 1795- I'm confused. It sounds to me as though you're saying that the operating system is going to prevent the next epoch from being sent. But in doing that, how is it validating the client capability? So the operating system, the way it interacts utilizing the transmission control protocol, is it will not, you're correct, it will not send the next epoch until it's received that confirmation. By relying upon that confirmation, which the delay may be related to a very slow network. For example, if you have a very fast pipe, you might- By sensing the delay, they're checking the client capability. It says when it comes back- That's your theory, right? More or less. Once the confirmation comes back and it says the end user, the client, the attendee has received epoch 1, I'm ready to send my next epoch. What do I have? It's epoch 10. I'm going to send epoch 10. Well, in between, there's epochs 2 through 9. Epochs 2 through 9 included data. That data was representative of content and it was representative of size. Now think of a flow- So in other words, you've got several different clients out there. Some of the clients have fast systems, some have slow systems. Let's take the slowest system can only pick up one out of every 10 epochs. Therefore, the conference, the central computer, the one that's sending out these epochs, is going to wait, in the case of that last slow computer, is going to wait until they say, we've got an open door. We've processed number 1, and it's going to send out whichever one is at that point in the queue, which in the case of the slow computer, is number 10. Yes. And you say that constitutes validating the client's capabilities. In the sense that whether or not it is able to- I see I'm over my time, so I- Go ahead. That's the answer to the question. So with respect to providing that next epoch, it waits until there's- as Dr. Jaffe testified, there's a blocking signal that is issued at that layer of the system. And it will not send that next epoch, as you correctly noted, until it receives back that confirmation, and there's the indication, yes, the door is open. Okay. Thank you, Mr. Stern. We'll give you two minutes of rebuttal time since we asked a lot of questions. Thank you, Your Honor. Mr. Jacobs. Thank you, Your Honor. And may it please the Court, Blair Jacobs on behalf of Citrix. I'm going to walk through the argument as it was presented by Pixion's counsel because it appears to me that the panel has a very good understanding of the issues as they exist here. First of all, with regard to the CU-CME system and the finding of invalidity and summary judgment by the district court, there's no dispute here that the CU-CME system was in public use prior to the critical date. It's actually on page 13 of the reply brief stipulated to here. Let me tell you what my concern is about the CU-CME system. And I'm willing to assume here for hypothetical purposes that the README files do represent the capabilities of the system. But the README excerpt on which you're relying for anticipation, it seems to me, is not exactly clear as to whether the system checked the client capabilities before the beginning of the conference call. And that's the language that you're relying on, as I understand it, appears at 5689. Help me understand. What really accomplishes that in the CU-CME system is described in the appendix in pages 3577-78. And it is the description of this CAP functionality that was employed, this CAP feature. So which pages are we talking about here? Yes, Your Honor. It is pages 3577-78 3577-78 of the appendix. And what this CAP feature in the server, I understand the CAP feature and what it does. The problem is I'm not clear what the CAP feature requires or in fact receives information about client capabilities before the beginning of the conference call. Oh, let me address that, Your Honor. So if you look at that portion that I cited you to in the appendix, it states according to 3.00B1, this is on 3577. I do not have the specific site in front of me, but it's where it says if a participant sets his maximum transmission rate above the CAP that you specified, he will automatically be disconnected. And so if one is automatically disconnected from the server, one has to have been connected already. That is what tells us that the connection to the conference server occurs before this validation, this checking to see if there is enough bandwidth. What's the basis for saying that the client's capability has been determined before the beginning of the conference call? Because what happens is the CAP feature checks and says is this particular client using too much bandwidth? After the connection occurs, if that determination is a yes, then the CAP feature disconnects. Correct, but that's happening during the conference call, whereas some of these claims require determination of the client capability before the call begins. It's after connection to the server, but before the conference begins. That's exactly the scenario right here. You're saying then that this material on 3576 and 377 describes a system in which the CAP function and disconnection if violative of the CAP process occurs before the beginning of the call, but after the connection. Is that of a client before the actual proceedings begin? Yes, Your Honor. So that covers all of the claims. That covers the claims where you have to validate prior to joining a call, and it also covers the feature of validating during the conferencing, if you look at that portion of the README files right there. But unfortunately, we don't have any extra testimony about that. Well, we actually do, Your Honor. So what we had here is Rule 56. What we had here is we had the README files. We had the source code, both prior to the critical date that's undisputed. We had the testimony of Mr. Cogger explaining the functionality of the system, and then we had Dr. Jaffe, the expert put forward on behalf of Citrix. I didn't see where Dr. Jaffe made the point that you just made. He made that point, and that point was emphasized in this report. Where did he make that point? Can you get me where he made that point, please? It was in his expert report. He clearly made that report, that point, and that point was adopted by... Well, part of the problem is there are only a couple pages, I think, from his expert report and here are the rest of it. On PACER, it's more confidential. So if it's not in the part that's in the appendix here, we don't have access to it. Okay. I understand, Your Honor. I understand. I thought it was... I think it's in the part that's not in the appendix. I thought it was in the part that was in the joint appendix, but we're going to grab that right now if we could. But he pointed at this precise portion of the appendix that I'm talking to and explained... I may be wrong, but I think that's not in the part that you included in the appendix. Okay. Well, we can certainly make that available, Your Honor. Absolutely. We can certainly make that available. Absolutely. So in the end of the day, what we have is we have the REBI file, we have the source code, we have Mr. Cogger's testimony, Mr. Cogger who worked with his hands with this project for years, and then we have Dr. Desai's testimony. So at that point in time, we have a rebuttal burden. The burden shifts to Pixion to come forward and to point to what element in the C-You, C-Me system does not exist. Now, they went after a couple of different things below. First of all, they talked about the conference server and they said there is not a conference server and the argument that they made was that there was not a conference server because the claims required what is known as a smart server and they made... and they alleged essentially that the C-You, C-Me system was not a smart server. However, during claim construction, they had sought a very broad construction of server that included a dumb, a smart, any type of server basically. So that element is clearly in the C-You, C-Me system. No real dispute there. They also argued that there was no web browser. There's a web browser that's required by the claims. However, when you look at the README files, when you look at the videos, we have presented some snapshots of some of the videos of the C-You, C-Me system. It was essentially brought live by Netscape. And Netscape clearly is a browser and there's really no dispute. It really wasn't something that was focused on in the brief with regard to being an element or limitation that's missing. The crux of the argument appears to be this argument with regard to Mr. Klausner, but the problem with regard to whether Mr. Klausner can create a material issue of actual dispute or not with regard to his testimony is exactly what the panel observed. Mr. Klausner testified that he has no opinion as to whether the README files actually correspond to the functionality provided by the source code. So his testimony can't create a material issue of factual dispute. In the end of the day, what we have here is we have the README files, we have the source code, we have Mr. Cogger's testimony, we have Dr. Dufay's testimony where he ties every element and limitation, and then we really don't have any specific element or limitation pointed to. What they tried to argue was kind of a functionality argument. They said this was an evolving project and if you look at the January README files or if you look at the source code, that doesn't tell us the functionality of the system because it was evolving. But the case law does not require enablement with regard to 102B public use. Mr. Jenkins, do you want to move to infringement a little bit? Yes, Your Honor. Thank you very much. I'd like to do that. So with regard to infringement, the main argument that we've been discussing here has to do with, and I think Judge Dyke hit this very nicely in his questioning, is there anything in the Citrix SetSync system which works with the Atomic Push software that would show that there is conferencing information provided and the characteristics of that conference information are based upon at least one user's capabilities. That's in every claim of the four patents that were found to be not infringed as part of the summary judgment process. There has been no evidence put forward in the record showing that the SetSync system knows what the client actually is doing bandwidth-wise, what information the client has. The SetSync software is different than what was described in the claims of these four patents in that it essentially is purely determining, looking at the presenter's screen, is there additional information that needs to be sent out. After it makes that determination, it works with a conference server, which, by the way, the conference server is based on an operating system that is unrelated to the SetSync software. I think that's very important. It decouples, doesn't even know what's going on in the operating system. And so, basically, the SetSync system just says, are there changes on the presenter's screen? Okay, let me go ahead and send that to the conference server, and then the conference server will look. That's the epoch. That's the screen snapshot. Data package. Which are the epochs. Milliseconds. It checks very, very rapidly. And so, inherently, there's no dispute that if there are, say, three computers hooked up, three clients, and one has a faster network than another, well, there may be an epoch that is skipped. However, this is the key distinction with regard to this point. The SetSync software never knows that, and neither does the atomic clock. That's the question that Mr. Springer was turning around and saying, well, it actually does because it has to wait until, as my way of expressing it, the door is open before it can send another epoch down to that slow computer, the slow client. The SetSync software does not do that, and it does not know that. That's the operating system. Oh, I see. So, you're saying that that is a function that's performed entirely by something other than your... It could be Apple OS. It could be a Microsoft OS. It could be any type of operating system, essentially, but it is not SetSync software that knows that. In fact, SetSync knows nothing at all about the client capabilities. It's designed intentionally not to do so, and the reason is that it's fairly complicated to have your software have to go through different algorithmic processes and figure out the differences between users. That was helpful in the mid-'90s, late-'90s, when bandwidth concerns were so extreme. Not so necessary, flash forward to 2008, 2010. Well, presumably, you can produce these epochs at a higher rate, and therefore, you haven't missed anything. Absolutely. Absolutely. But what you're saying sounds... What you're saying is, well, we've assigned the task of validation, for lack of a better term, to the operating system, and therefore, our hands are clean, but the system as a whole works by... And it's an essential part of the system as a whole to have this sending of epochs when the door is open, which happens to be performed by the operating system, but it's part of the entire system, right? But the question in my mind is, even if you assume that that is... That the operation of the operating system is attributable to you as part of your overall system, does that process of waiting for the doors to open and then shooting the next available epoch constitute validation or responding to the capabilities of the clients? Let me try to help you as clearly as I can on that. First of all, two of the patents require that this validation occurs before a client logs on, so those are easy. Right. Now we're talking about the conferencing... I'm talking about the during. Right. It's the third and fourth patents. So that's the 1191 patent and the 331 patent. So right, two of the patents, there's no evidence at all of record, but if we're going to talk about the conferencing system, now we're talking about does the conferencing system receive information from the client? In other words, basically what the conferencing system is looking to do is it's just looking at a pipe. Is the pipe open? If the pipe's open, information, the epochs get shot out. That's all it's looking for. It's looking at is the pipe open? That does not get us to the point that even if we were looking just at the conferencing system, is that based upon a characteristic of the client? And the bottom line is this wasn't in the expert report of the plaintiffs below. This was not a theory that they vigorously pursued. It's in the brief, but they didn't pursue it. It wasn't strongly pursued in their infringement contentions. And so they focused on the set sync software and the atomic software, which really is the accused product. That's what Citrix makes. Citrix doesn't make the operating system. They make, they actually make the software so that it's decoupled from the operating system so that it doesn't even know what the operating system is doing. So how can you then take whatever the operating system may know with regard to this pipe span and impute it back to the set sync accused product? Okay, but assuming that we were to do that, is there an additional argument available to you that simply detecting when the door is open with respect to several different clients with different capabilities constitutes validation of the client capability? It has not been... I see my time is up. May I respond, John? It hasn't been an issue that's been substantially explored, but I do think there would be an argument for two reasons. First of all, there's going to have to be a finding of inherency, essentially, because you're talking about an inherent modification of characteristics by not sending, by choosing to not send. But what's your position as to whether sensing the delay or sensing the door is closed or open, it does not satisfy the claim limitation? That is not based upon a client capability. Certainly not at the Citrix level with the operating system. Forget about the Citrix level. Your position is that's not determining a client capability. That is correct. That is not determining a client capability. It's not a characteristic. It's just checking to see whether a pipe is open or not, basically. Thank you, Mr. Jacobs. Thank you, Your Honor. Springer has... Excuse me. I take it you haven't found that Dr. Trafave's testimony. We'd be happy to supplement, Your Honor. Please submit it to us. Thank you, Your Honor. I appreciate it. Mr. Springer, you've got two minutes to rebut. Thank you, Your Honors. So, Judge Bryson, I'd like to hit on a point that you addressed with respect to the SetSync interacting with the... the accused product and SetSync interacting with the operating system. I don't think it's fair to say they're decoupled. If you look in the record at 4973, this is the testimony of the chief scientist of Citrix, one of the designers of SetSync, Dr. Alexandrov. And he says on 4973, if you actually look at page 275 of Dr. Alexandrov's transcript, he's talking about the operation of SetSync. And he says at line 4, and they would send it, you know... 4973? 4973 of the record, Your Honor. And Dr. Alexandrov says, you know, the DCP, he meant TCP, the DCP connection and the DCP socket is provided by the operating system. And the API, the programming interface the operating system provides, will allow us to send data. And it will also, when the operating system is not capable of taking more data, you know, it will refuse to take data. So, more data. So, we would know. So, I don't think it's fair to characterize the SetSync component of GoToMeeting and the accused products to have no knowledge or to be blind with respect to what's going on with the operating system. At the end of the day, there's multiple references throughout Dr. Alexandrov's testimony. And again, looking at the record at 4959, 4962, 4973, he talks about SetSync integrating with the operating system, utilizing the API, utilizing transmission control protocol and the communication socket to transmit. The fact of the matter is, GoToMeeting and the accused products will not work without that operating system. So, I mean, it's even on the packaging. You have to have a basic operating system for the system to work. Returning to the C-U-C-Me issues, however, again, there's no dispute that a C-U-C-Me conferencing system existed prior to the critical date. But again, that has to show each and every limitation. And again, Pixion contends that based on the disputes raised by Mr. Klausner and his rebuttal and his deposition concerning what was not shown in the source code, I see I'm out of time. If I may just finish my thought, Your Honor. Coupled with the fact that Mr. Cogger was not the best person to testify on these issues and further in light of the fact that the videos just show videos. They don't show the secret sauce going on behind the scene. By watching a video, you don't see a conferencing server providing conferencing data based on a client capability. That capability not being necessarily a capability of the client per se, but based on the court's construction and the bandwidth between a client and a server. So I think it's important to look very closely at the court's construction, the district court's construction, with respect to those client capabilities because that's inclusive of the bandwidth connection between two nodes in that computing network. Thank you, Mr. Springer. I think we have your thought. We'll take a close under advisement. Thank you very much, Your Honor.